The next case this morning is the case of Irvington Elevator Co., Inc. v. Robert Jeffrey Heser, Robert Jules Heser, and Andrew Jason Heser. We have Robert Seltzer for the Appellant and Chris Petrie for the Appellee. You may proceed, Mr. Seltzer. Thank you, Your Honor. Good morning. May it please the Court and Counsel, I represent Irvington Elevator, which is a community green elevator in Irvington, Illinois. And this case involves a series of transactions that were called in over the phone by the defendants. For purposes of this appeal and the summary judgment that was entered below, I believe it's accepted that those verbal agreements were in fact breached. What this case turns upon is whether those agreements can now be enforced. The Court below found as a matter of law that they could not be. But this is a uniform commercial code case. It's a case involving transactions between merchants. And as our briefing has explained and as I will do my best to explain this morning, that makes a critical difference in this case that calls for reversal of the lower court's determination. What we alleged in our underlying petition was that phone calls were placed at one point and a series of approximately two dozen agreements were reached over the phone whereby these farmers would at some point in the future, as much as two years into the future, would bind themselves to deliver grain at a certain degree of price. Given the nature of grain transactions, state law in Illinois requires that a grain elevator such as us has a requirement to hedge. In other words, when we reach an agreement with somebody, given sometimes the volatility of the grain market, we then have to turn around and enter into a contract with a grain broker to confirm that we will take the grain we receive and we will immediately sell it then to a grain broker, in this case in Chicago. So what has given rise to this suit is we contend that these farmers reneged on their deals with us. In other words, when the market moved, in fact it spiked upward, it became expedient for them to disavow the agreements they had reached with us. And legally the question is can they be held to the bargain that they struck with us because we don't have a written agreement here. We don't have a signed writing. If this were a common law case, we all know the strict requirements of the common law contracts. If we didn't have a signed writing, it would be difficult for us to prevail in a case like this. And I would point out, by the way, that in the summary judgment record that we have put before the court, our expert signed an affidavit where he calculated that if these farmers sold the grain at the peak of the market, then they would have pocketed something like a million and a quarter dollars above and beyond the amounts that they were bound to us to sell for. So the UCC, like the common law contracts, has a statute of frauds. Statute of frauds begins in familiar fashion by stating that if parties enter into an agreement, there has to be a writing signed against the party that you're seeking enforcement against. We don't have that. The Uniform Commercial Code, though, recognizing that commerce, especially between merchants who engage regularly in business in a particular area or industry, often deals differently than the public at large, has carved out what's called a merchant exception. And so what the merchant exception says is that even if you don't have a signed writing, if a party enters into an oral agreement and then within a reasonable time, and reasonable is a huge word here, what we're going to be talking about, if within a reasonable time a confirmatory memoranda is sent to the other side, then an agreement can nevertheless be enforced. In other words, the statute of frauds does not then apply. The statute also says that the party to whom the memoranda is sent, the confirmation, must object to the agreement within 10 days. The record will show that there's no objection ever sent. So the question then becomes whether or not we sent a confirmatory memoranda within a reasonable time. The facts in the summary judgment record are this. These orders were called in, they were placed, and anywhere from a few days up to four months later we sent confirmatory memoranda. The facts of this case are that in no circumstances, even the latest confirmation that we sent was at least six months ahead of when the grain would have been delivered on the earliest transactions, and in many cases up to two years in advance of when performance would have been required. The Uniform Commercial Code spells out in Section 1104 that reasonableness, whenever reasonableness is a consideration in any transaction governed by the UCC, then the courts are to look, if it's applicable, to coercive dealing between the parties, which is prior dealings that the parties have had and practices as between them, and on a separate basis, usage of trade. So usage of trade would be if there is a custom in a particular industry for doing something in a certain way, then that can help to inform and even explain what the understanding was between the parties, because that understanding is important because, as we all learned in law school, contracts are based upon a meeting of minds between the parties. The UCC doesn't vary from that in any respect. So our factual record, which, of course, under the applicable standard for summary judgment, is that if there is a controverted issue of material fact, it is to be taken in our favor, and we are entitled to our date of trial before a jury. We ask for a jury trial in this case. Our record spells out that these parties had done business before. Over a two-year period, they had entered into similar hedged-to-arrive contracts. We had confirmed the oral agreements that had been called in over the phone in the same fashion as here, and those contracts had been performed. So unlike some of the cases that have been cited in the briefing, course of dealing is, in fact, an issue here and helps to inform this court and the court below as to whether an agreement was reached. Each party had experts, and the experts weighed in on the issue of usage of trade, which, again, is something separate and distinct from course of dealing. One expert said, Before you get into usage of trade, what's your best case on course of dealings between the particular parties? I've cited a number of cases that talk about how course of dealing does inform the issue of reasonableness. Some of the cases go out many months. They, of course, have cited, as I would, their best cases, high-water mark cases, where under the particular facts of those cases, a shorter period of time was considered to be the dividing line. But there is no bright line here. Right. The basis of your argument, if I understand it correctly, is that both of these questions, usage of trade and the prior course of dealings, are fact-specific. I'm sorry? Fact-specific. I'm finding a goal. Fact-specific. That is absolutely right. The finer fact has to consider all of these things. You know, if we were given our right to have this claim heard before a jury, I'm sure that the other side would very forcefully argue to the jury that, you know, that confirmation in some cases here was up to four months after these were called in. But that's not the only fact for the court, for the finer fact to consider. And I would point out, you know, there are two cases from Illinois that have been briefed pretty heavily by the parties, and the parties seem to each find some kernel that they embrace in the case, and obviously you can read these cases yourself. Bureau of Service was a case where there was an eight-month delay in sending a confirmatory memoranda, and the defendants point to that, and they say eight months is a matter of law. It's unreasonable. Therefore, you should find against the plaintiffs in this case. But the facts are a little bit different in Bureau of Service. First of all, there was no previous course of dealing between the parties, so that issue didn't come in. It is a factor in this case. There are other factors as well. The grain merchant who took the order in our case, it's undisputed, he was a relative of these farmers. He was getting a call from his family members saying we want to place this order. Surely a jury would consider that as well. Bureau of Service is also a case where the confirmation, instead of coming six months to two years in advance of performance, came just two days before the month when originally at least the order was to be delivered. Now they extended that. Byington is the other case that is heavily briefed by both sides in this case. In Byington, the confirmation came seven months after the orders were called in. And, again, I think the defense would like you to consider the amount of time, the delay between the order and the confirmation, and then stop there. But, again, the code says it has to be reasonable, reasonable considering all of the circumstances. One of the circumstances in Byington was the court found that, in fact, the seven-month confirmation of the oral agreements that were struck was not the usual practice between the parties. So we have a situation here where the trial court below looked at the facts. Almost all the facts are hotly in dispute. Both sides have adequately cemented their position on the disputed facts as far as what was said and when it was said and that sort of thing. The only thing that's not disputed is when the orders were placed and how long it took us to confirm them. And if that were the only consideration here, I would still be in front of you telling you that it would be a matter for the jury to decide whether or not we meet the requirements of this exception that the legislature has put into the Uniform Commercial Code. But that's not the only- Can you address the distinction the plaintiff makes between applying course of dealing to contract interpretation versus formation? My understanding is that for purposes of this motion, the contract is formed. It's a question of whether they can avoid it or not. But I'll do my best. What I understand the law to say here is that if you've got an agreement between the parties and it's not signed, then the agreement can nevertheless be enforced. In other words, there is agreement. There is a contract that is acknowledged. And that agreement can go forward and be enforced if we have sent the confirmatory memorandum within a reasonable time. But the plaintiff isn't conceding there's a contract. My understanding was that for purposes of this agreement, they're conceding that the oral orders were placed. And they're saying that they can void the contract in the sense that if there was a contract, they're saying we can void it because we can point to the statute of frauds as a defense. If the statute of frauds applies here, then we lose. It doesn't mean there wasn't an agreement. It just means that we can't enforce our position. But the Uniform Commercial Code lightens the burden of the statute of frauds and says that if between merchants, confirmatory memoranda are delivered within a reasonable time, then the agreement can nevertheless be enforced. And so course of dealing here goes to the issue of what is reasonable and what is not reasonable. It goes to the issue of the totality of the circumstances and whether or not we can escape the harsh consequences of the statute of frauds. So course of dealing is not an issue to contract formation here. Course of dealing applies merely to whether or not under the factual record that we would, that we stand ready, willing, and able to present to a jury whether or not our confirmatory memoranda will have the effect of allowing us to escape the statute of frauds. That's what the issue is here. And I would point out again that they never objected. They never objected to this. Now, they're saying, well, we don't have to object because if you didn't deliver this within a reasonable time, then our statute of fraud defense applies and we win. But they don't get to win at this stage of the case. We all know how important a right to a jury trial is under our law. We all know what the standard is for summary judgment. The standard is recited in the cases to say that the entry of summary judgment by the trial court may only be affirmed if there are no material facts. And those facts, if they are in dispute, are deemed to be read in the light most favorable to the party against whom the motion was filed. And that was us. I want to point out also that we had a completely separate claim from the statute of frauds. It's not based on contract. Promissory estoppel. You can read the briefing yourself and you can see if this was briefed at the court below. But I will tell you that in the summary judgment briefing that was submitted to the trial court, there was not a word mentioned by the movements on promissory estoppel. Promissory estoppel is a valid claim under Illinois law, according to the Illinois Supreme Court. And the trial court issued its ruling, and we couldn't tell whether it threw the entire case out or just our contract claim. So we went back and we asked for clarification. The other side then went to the court and argued that, oh, well, of course it includes promissory estoppel. And then the court came back to us and after telling us that this case was appropriate for appeal, did not explain any further the scope of its ruling. The case law, there are two cases in Illinois where promissory estoppel has been examined in the context of a case that would also be under the UCC. And, of course, the losing parties in those cases had argued that the UCC statute of frauds ought to also preclude a promissory estoppel claim. And in the two cases, and the most of Jenkins and Baller is the first case, R.S. Bennett is the other, in both of those cases, the court said that a promissory estoppel claim ought to be able to go forward. And I would especially urge you to read the Jenkins and Baller case because it's very close to the facts that we've got here. Jenkins and Baller doesn't involve grains, but it involved a general contractor who had solicited bids from subcontractors for certain aspects of a job that it was going to do. And so it got a bid, a firm price from a subcontractor, and the general contractor then incorporated that into its bid, went out and bid a job. Well, it won the job. And so it went back to its subcontractor and said, We won the job. Now we need you to perform on the bid you gave us. The subcontractor says, You know what? I really don't want to perform anymore. And since you don't have a signed piece of paper, I don't have to. I don't have to perform.  And the court in the decision said that that states a claim for promissory estoppel. They have relied, you know, the plaintiff relied upon the statements or representations made by the other side. They've been damaged as a result of the subcontractor in that case reneging on their promise. And it would be unjust, and it would be simply unjust to allow that to happen. In this case, we relied on the orders that they placed over the phone. And we went out. We're not fighting here over some thin profit margin on a grain deal. We have been damaged. We have been significantly damaged in this case because we went out and hedged, and we bound ourselves firmly to a grain dealer in Chicago. And it will be for the jury to decide, if I'm fortunate enough to convince you that this should be reversed, which in my heart I believe it should, it will be for a jury to decide the facts of this case, but the facts, again, that we have alleged is that the price of grain went through the roof, and these people decided that they no longer wanted to honor the commitments they made to us. We didn't have that luxury. It wasn't a luxury for us. We lived by our contracts. We honored them. And we lost, according to the record, we lost $440,000. And that's not even half of the estimated profit that we believe that the defendants made as a result of turning their back on our agreements. The defense cites a number of promissory estoppel cases that don't have anything to do with the UCC. If you look at them in our briefing, we've distinguished them. Vermillion, for example, was an employment contract. And the court found that the plaintiff in that case didn't even satisfy the general requirements of promissory estoppel because he'd gotten paid. You can't be damaged if you've been paid. So, again, this is a summary judgment case where the trial court below found as a matter of law that there was somehow a bright line and that under no circumstances could a jury find otherwise. Under no circumstances was our confirmation of these called-in orders reasonable. And I would submit to you that it was not for the trial court to do that. The trial court, with all due respect to it, has usurped its power. This was an issue reserved to the jury under Illinois law. And we should have given our chance to go back to court and to make our case to a jury. And you know what? If a jury decides under all these facts that we didn't respond soon enough, then so be it. So be it. But it was not for the court to make that decision. Thank you. Thank you, Mr. Seltzer. Do we have anyone above us? May it please the court. Counsel. My name is Chris Petrie of Byron Carlson Petrie & Cowd, and I represent the defendants in counterclaims in this matter, Robert Hesser, Robert Hesser, Jr., and Andy Hesser, who are three farmers who reside in Marion County, Illinois. Now, the plaintiff talked about a lot of facts, but I want to talk about what the material facts are before I talk about the points on appeal. And these are the material facts. The plaintiff is a grain elevator. The Hessers are farmers. The plaintiff alleges that the Hessers entered certain oral contracts. All of the contracts were future delivery contracts. Those are contracts that call for the delivery of grain in the future with a set price for the grain. All of the alleged oral contracts are for an amount over $500. All of the alleged oral contracts were allegedly confirmed with a confirmation that was sent two months to four months after the contract date, except for one contract addition in the appeal, number 2728, where the confirmation was allegedly sent 16 days after the contract date. Those are the material facts, and there's no dispute in those material facts. And given these undisputed material facts, Illinois law holds that as a matter of law, the alleged oral contracts cannot be enforced because they are within the statute of frauds, which is exactly why the trial court granted our motion for partial summary judgment. And that brings me to the first point on appeal. The trial court properly granted our partial motion for summary judgment. In this case, you heard counsel say that the UCC makes things different. It makes things different. Every case I'm going to talk about, or at least the great majority of the cases I'm going to talk about, Bureau of Service, Byington, Vermillion, all of those cases are UCC cases. I'm also going to talk about the UCC statutory language. So in fact, the UCC is what compels the summary judgment in our favor. So let's start out here with the basic principle. The UCC states that if a contract is for a sale of goods of $500 or more, the contract must be in writing and signed by the party to be charged. Here, as I stated above, it's undisputed the Hesslers did not sign any of the alleged oral contracts. Now, there's an exception to the statute of frauds called the merchant's exception or the confirmation exception. And what that exception states is if an alleged oral contract is confirmed with a memorandum that is sent out within a reasonable time from the alleged oral contract date and it's not objected to within 10 days, then the contract comes outside of the statute of frauds. And in this case, that is the main exception that the plaintiff is trying to rely upon. As I said before, it's undisputed in this case that for the alleged contracts at issue, the confirmation wasn't issued until two to four months after the alleged contract date except for one confirmation that came out 16 days after the alleged contract date. Sixteen or fifteen? Sixteen days, Your Honor. Now, there are two Illinois cases that are right on point that compel summary judgment. And they are UCC cases. That is the Bureau Service case and the buy-in case. In Bureau Service, a case involving unsigned future grain delivery contracts, the third district held as a matter of law that the confirmations sent eight months after the alleged oral contract date are not sent in a reasonable amount of time as a matter of law. And the court cited two other cases, the Lish case and the Cargill case, which are out-of-state cases. This was the Seminole case in Illinois, so it looked to out-of-state cases. And those cases hold that as a matter of law, a confirmation sent 12 days after the alleged oral contract date is too late, it's unreasonable in the amount of time. And another one holds that a confirmation sent 25 days after the alleged oral contract date is unreasonable as a matter of law. And the Bureau Service court and these courts that it relied upon had a big part of their rationale. It's the volatility in the grain market. It's the volatility in the grain market that makes this unreasonable as a matter of law. We don't want people to sit back and see how the market performs before they send confirmations. We also, because the market is so volatile, we want confirmations to be sent out right away so that the person who's writing the confirmation gets the terms right and the person who has a chance to object to the confirmation has a clear memory of what the contract was. That's the central purpose of the statute of frauds, is to make sure the contracts are recorded correctly. If you wait an unreasonable amount of time, two to four months, particularly in an incredibly volatile market, there's all kinds of chances for errors. I should also point out, it's very important, counsel said that in the Bureau Service case there was no history of the course of dealing. I'm reading right out of the Bureau Service case. The record established that the parties had been doing business with each other prior to the controversy at issue for a period of approximately 10 years. Later on, the opinion goes on to say that it was an oral course of dealing that they had. So, in short, there are two cases that are right on point, that are UCC cases that compel summary judgment in this matter, and that's really the meat of this appeal. The rest of this is just the plaintiff making up arguments to try and get around those two cases, and I'll explain why those arguments do not appear. The first is, the course of dealing is a red herring. Course of dealing, custom and trade, it's a red herring. Here's the reason why. Let's first start with the UCC language itself. The UCC states, a course of dealing between the parties gives particular meaning to and supplements or qualifies the terms of an agreement. So, the language of UCC itself indicates that a course of dealing is used to interpret contracts, not to create contracts in violation of the statute of frauds. The case law states this as well. The Ozier v. Haynes case from 1952, this case was interpreting the statute of frauds for the sale of personal property over $500, and that is a predecessor to this UCC provision. And Ozier also involved a hedge grant, as plaintiff has relied on here. In Ozier, the elevator ends up suing the farmer saying he didn't deliver on future grain contracts. The farmer defends the statute of frauds. The elevator says, well, it was our course of dealing to do this. It was our course of dealing to do these things orderly. What did the Ozier case say? What did the Supreme Court hold? Well, there are many instances where custom and usage have been used to interpret an enforceable contract. We know of no case, and none has been brought to our attention, where custom and usage have been held to create an enforceable contract. This Court has no authority to give license to the usage, which is outside of methods established by rule of law. We can only say that those who pursue other methods operate at their own risk. You're basing your argument of Ozier, which is a pre-UCC case, on your formation of contract argument position, rather than the reasonableness of confirmation of an oral contract that has been formed. It's more than just Ozier. Ozier is just one of my baseline cases. But it is a pre-UCC case. It is a pre-UCC case, but it was interpreting the sale of personal property over $500, which is a predecessor to this. But there have been cases since the UCC was passed that have these kinds of holdings. First, there's the Vermillion case, which was eight years after the UCC and this provision was passed. And the course of dealing came up in that case. And what did the Court say about the course of dealing? Under the UCC, a course of dealing between parties or trade usage as therein defined is used as a factor to determine the commercial meaning of the agreement, which the parties made and not displace or negate established rules of law. Isn't the formation of a contract a genuine issue of material fact? No. It's not a genuine issue of material fact. Why not? Because the question is the creation of an enforceable contract. And in this case, there is the statute of frauds about which there are no disputed material facts makes it such that there's no enforceable contract as a matter of law. That turns on the dispute regarding what's reasonable. That turns on a dispute regarding what's reasonable, but if there is case law that says this is unreasonable as a matter of law due to the delay in the confirmations for the very reasons that I talked about in the beginning, the fact that we don't want people to sit back and watch what the market does before they send their confirmations. We want confirmations to go out right away. Terms of the contract can be accurately recorded by the confirmation maker and either objected to or not objected to by the farmer. I hope I've answered your question, Your Honor. I understand your position. That dispute about whether we entered the contracts is not a material dispute for this purpose because the statute of frauds, which is based solely on undisputed material facts, negates the alleged enforceable contract. Counsel, you say course of dealing. Is that with these parties or with parties in general? So in other words, they've had no course of dealing before? No, these parties have had a course of dealing. And it's been always oral? No, it has not always been oral. There was oral before they dealt? I believe sometimes it was oral and sometimes it wasn't. And how late were the confirmations on the first ones, the ones that were oral? Your Honor, I'm not sure as I sit here. I'd have to check the record on that. In any event, another reason, giving you the course of dealing, the question you asked me about the course of dealing, there's Bureau of Service itself. Bureau of Service itself holds, and in that case, as I read from the case, the parties had a 10-year course of dealing with oral contracts and delayed confirmations. And the appellant raised that very argument in Bureau of Service. Its brief is in the record. The appellant's brief is in the record in Bureau of Service. It raised that very course of dealing argument, and the court rejected it. In fact, it thought so little of it, it didn't even mention it in its rationale. And finally, you asked what cases does the plaintiff have that states the course of dealing is somehow relevant. There are none. There are no cases from Illinois that suggest that. They do cite a couple of federal cases. They're from the First Circuit and the Fifth Circuit. They're not Illinois cases. They're in contradiction to Bureau of Service in Byington, and they don't deal with volatility. They don't deal with the grain market. They deal with office equipment and cattle. And so the volatility in the market that compels the holding in Bureau of Service in Byington was not present in those cases. They also tried some other arguments, all of which are refuted expressly by Bureau of Service or otherwise. For instance, they tried to maintain that you don't measure the reasonableness of the time between the alleged oral contract and the confirmation, but rather from the time of confirmation to delivery. But Bureau of Service deals with that exact question, and that very point was raised in Bureau of Service as well in the appellate brief. What did the court say? The court said the question before us is whether the passage of some eight months between the oral agreement and the confirmatory writing was a reasonable time. Bureau of Service was explicit. We are measuring from the alleged oral contract date to the date that the confirmation is allegedly received. And as I've said, in this case, for all of the contracts at issue, it's two to four months except for one in which it's 16 days. And that volatility in the market, that was occurring while this was going on. The plaintiff also says that the UCC states that in determining what's reasonable, you take into account the nature, purpose, and circumstance of the transaction, and therefore, it must be a fact-specific decision. Yet Bureau of Service and Byington both made their holdings as a matter of law. And they both stated that they were taking into account the nature, purpose, and circumstance of the transaction, and what was driving their decision was the volatility in the grain market. They also maintain that Bureau of Service and Byington are distinguishable. They stated that in Bureau of Service, the confirmation came in two days before the alleged delivery date. But if you look at the case carefully, actually, the plaintiff in the case alleged that the contract was extended, and such that delivery wasn't due for six months or more after the alleged confirmation date. So they're just simply wrong, as a matter of fact, in reading that case. And I would also point out that even if the delivery date were still intact, there's nothing in Bureau of Service where the court says something like, we hold this time frame as unreasonable as a matter of law because the farmer only had two days to perform. Mr. Petrie, is there the volatility of the market, is that, does Bureau use that generically, or is it specific to the case? It's specific to the grain. It's unsigned grain contracts. Well, I understand that. I'm saying that, I think you pointed out that in this case, there was huge volatility during the period of time. Oh, I think Bureau of Service is using the term generically. I don't think, it doesn't go into a detailed analysis of what happened with the prices or anything like that. So I would say it was using it generically. And that's because that's a risk, regardless of what happens in a given time. The law isn't about what happens in this given time. It's about policy. We don't want people to sit back and have the opportunity to send out confirmations after seeing what the market's done. And we want them to come out quickly so that the contract terms can be reported correctly. Regardless of what happens in a given time, that's what the law is, that's what's driving the UCC. The plaintiff also intends that Bureau of Service is distinguishable because this case involves hedge-to-arrive contracts and future delivery hedge-to-arrive contracts. And in Bureau of Service, it was a conventional future delivery contract. And in fact, that distinction only makes summary judgment more appropriate for us. Because in a conventional hedge-to-arrive contract, there's one point of volatility. And that's the price in the contract versus the Chicago Board of Trade's future price. In a hedge-to-arrive future delivery contract, there's actually two points of volatility. One is the one that I just explained. And the second is the fluctuating basis. And basis, more or less, is a way that you express the cost of transit of the grain to market. And in basis, the point of volatility is the difference between the Chicago Board of Trade's future price and the cash price that an elevator is offering on a given day. Because that cash price takes into account the cost of transit and bringing the grain to market. So because it is more volatile, Bureau of Service's rationale is even more applicable to this case. The plaintiff also relies on another exception to the statute of frauds, although their argument on it is very short and it wasn't mentioned in this oral argument. They argue that the judicial admission exception is applicable here. But the judicial admission exception requires that the defendant admit in a pleading in court or under oath that they entered the contract. And in this case, the defendants denied the contract in their answer and under oath. And what the plaintiff said in its brief is, well, we want the chance to cross-examine the defendant at trial. Maybe they'll change their testimony. I plan to put on a great cross-examination. Maybe it changes testimony, and therefore the exception should be satisfied. But in the DF Activities case, which is cited in my brief, the Seventh Circuit interpreting the Illinois UCC, Judge Posner wrote this. Once the defendant has denied the contract under oath, the safety valve of section 2201.3b is closed. The chance that the defendant might be badgered into withdrawing his denial at trial is too remote to justify prolonging an effort to enforce an oral contract in the teeth of the statute of frauds. That's exactly what they're saying in their brief. Exactly what this case holds, you cannot do. That's exactly what they're doing here. I just want to talk about promissory estoppel quickly. This is point two of the appeal. The trial court properly granted our motion for summary judgment on the promissory estoppel claims. And I'll get to the reason in a second. But the first argument that the plaintiff makes here is that the promissory estoppel claims were not included in our motion papers. However, the motion clearly states that we're moving for summary judgment on our statute of frauds affirmative defense. And the statute of frauds affirmative defense was alleged against both the breach of contract claim and the promissory estoppel claims. So it was in the motion. Even if you believe that it wasn't in the motion, the trial court didn't rule on it in the first instance, the case law is clear that when a decision can be made as a matter of law, as this decision can, you may rule on it in the first instance. In this case, Illinois is littered with cases holding that if the statute of frauds defeats a breach of contract claim, it defeats a promissory estoppel claim arising out of the same set of facts. That's the McHenry case, the McBride case, the Dickens case. All of those cases are laid out in my brief, and I've given you the holding and the facts in great detail. So I'm not going to belabor you guys going over those facts. I just want to address a couple of things that were said about the promissory estoppel here. Counsel asked me to take a look at the Bennett case from 1979. Well, I submit to you that the cases that are in my brief all are 1990 or later, and the promissory estoppel question about how the statute of frauds and the promissory estoppel work, the case law was being developed through the 70s. So this case is an old case, and it is not instructive here. I'll also point out they talk a lot about UCC cases. The cases that are in my brief are not UCC cases. But if you look at footnote 17 in my brief, I have a string cite in there, and two of the cases there are UCC cases from the Seventh Circuit interpreting Illinois law. It is abundantly clear, if you look at the case law, that if you bring a promissory estoppel claim and a breach of contract claim, and the breach of contract claim fails due to the statute of frauds, a promissory estoppel claim based on the same facts also fails as a matter of law. That's really all I had on the second point. I'd be happy to answer any questions if you guys have any. Thank you. Thank you. Mr. Schultz, do you have rebuttal? I do, Your Honor. It would have been very easy for the legislature to have put a bright-line deadline on how long a party has to send a confirmation of an oral contract, but they chose not to. UCC says it has to be within a reasonable time. Once again, Section 1104 of the UCC says that what is reasonable, which applies here, depends on the nature, purpose, and circumstances of the transaction. I submit to you that the course of dealing between the parties and the other factors that we've highlighted in this case form part of the circumstances that the finder of fact needs to look at. The course of dealing can also be used to flesh out what the contract is, but that's a different use. I didn't fully grasp your question earlier, Judge, but I'm trying to follow up on it here. So there is no statute of limitations here. There are cases I've cited where longer delays than what we're talking about here were deemed by a court to be reasonable. But it would be simplistic for me to point to those and simply say, well, here, here's a case where confirmation went five months. Therefore, ipso facto, it's reasonable per se. It's not that simple. You have to look at all the facts and circumstances. The cases that we've been talking about, Byington and Bureau of Service, clearly look at those circumstances. Bureau of Service, by the way, re-read it since I got here, talks about the fact that parties have done business together before, but the course of dealing, I'm not aware. There's not in their record an issue of prior confirmations and a prior history of lengthy time periods between placing of the order and confirmation of the order. And I would point out again that in Byington, in fact, the facts went the other direction. The confirmation that was given in that case seven months out was contrary to the course of dealing between the parties. What do you say the course of dealing is? I missed that. Yes, sir. And when I talk about course of dealing, I'm focusing here on the amount of time in past transactions that had elapsed between when the order was called and when somebody sent the confirmation. And what has that been? How many contracts and what has that been? How many contracts? Is it in our case here? Yes. Over 20. They were called in at various times. And what was the time? What period? Over a number of months. And in some cases we confirmed, you know, my understanding of the record is a few days, but I agree with counsel when he says that at the latest some of them were four months out. I meant that they spanned a period of how long? Performance, as I understood it, spanned a period of, say, 18 months or so from when the first ones were to be performed as to when the last ones were to be performed. And our confirmations in every instance were at least six months ahead of performance and sometimes two years ahead of performance. These cases, the bottom line is these cases are fact specific. The prior fact has to look at all of these issues to decide what is reasonable and what is not. Again, OSEER, as the court pointed out, OSEER is fine. You know, we'd probably lose if the law in OSEER were applied to this case, but it's not. The UCC makes it easier for us to confirm this transaction. It makes it easier for parties to do business. It makes it easier for parties to have expectations that the transactions they enter into will be enforced. And that's important for any system if business is to commence. I want to comment on volatility, too. I take issue with that. A hedge-to-arrive contract is not more volatile than a non-hedge-to-arrive contract. As we've briefed, a hedge-to-arrive contract includes a specific price term at the time the order is placed. The price can be changed somewhat by the basis, and the basis is a consideration that looks at the difference in price in Chicago versus local prices at the time of performance. But volatility is an extraneous issue here. If it's not an extraneous issue, then once again, it's another issue that the jury should consider when they look at this case. I want to point out, too, the judicial admissions exception. There are two federal cases that seem to say that if a party denies having entered into an agreement in its pleadings, that's the end of the inquiry. But the Illinois cases, they're older, but they're Illinois cases, say that that's one consideration, but if a party admits it in open court or otherwise, then the contract can nevertheless be enforced. So once again, there are lots of cases out here. The UCC is a common body of law. They are fact-specific. You can't point to one factor in any of these cases and say that the case turns on that one factor. Thank you. Thank you, Mr. Seltzer. Thank you, gentlemen, Mr. Chief Reef, for taking the manner of your time today.